1
2
3
4
5
6
7
8                        **UNITED STATES DISTRICT COURT**
9                          EASTERN DISTRICT OF CALIFORNIA
10
11   RITCHIE CORN,                        )      1:11-cv-00888 AWI GSA
                                          )
12               Plaintiff,               )      **FINDINGS AND RECOMMENDATIONS**
                                          )      **REGARDING PLAINTIFF'S SOCIAL**
13        v.                              )      **SECURITY COMPLAINT**
                                          )
     MICHAEL ASTRUE, Commissioner of      )
14   Social Security,                     )
                                          )
15               Defendant.               )
                                          )
16   _____ )
17
18                              **BACKGROUND**
19        Plaintiff Ritchie Corn ("Plaintiff") seeks judicial review of a final decision of the
20   Commissioner of Social Security ("Commissioner" or "Defendant") denying his applications for
21   disability insurance and supplemental security income benefits pursuant to Titles II and XVI of
22   the Social Security Act.  The matter is currently before the Court on the parties' briefs, which
23   were submitted, without oral argument, to Magistrate Judge Gary S. Austin, for findings and
24   recommendations to the District Court.
25   //
26   //
27
28                                          1

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed applications for benefits in January 2008, alleging disability as of May 17, 2007. AR 171-178. Plaintiff's applications were denied initially and on reconsideration; he then requested a hearing before an Administrative Law Judge ("ALJ"). AR 113-124. ALJ William Wallis held a hearing and subsequently issued an order denying benefits on June 18, 2010, finding Plaintiff was not disabled. AR 18-31. On January 6, 2011, the Appeals Council denied review. AR 1-4.

### Hearing Testimony

ALJ Wallis held a hearing on March 5, 2010, in Fresno, California. Plaintiff appeared and testified; he was assisted by attorney Gina Fazio. Vocational Expert ("VE") Kenneth P. Ferra also testified, as did Plaintiff's friend Lou Ann Dautrich Mathewson. AR 33-77.

### *Plaintiff's Testimony*

Plaintiff was born on August 13, 1952, making him fifty-seven years old on the day of the hearing. AR 39. He is married; his wife is disabled. AR 39. He receives general relief benefits and food stamps. AR 53-54. Plaintiff earned a GED. He did not receive any vocational training, nor did he serve in the armed forces. AR 40.

While he does have a valid driver's license without restriction, Plaintiff only drives occasionally because he is in constant pain. A friend drove him to the hearing. AR 39, 60.

Plaintiff became disabled on May 17, 2007, and has not worked since that date. AR 40-41. More specifically, he became "super dizzy," nauseated and sweaty; he thought he was suffering from heat stroke. He lost consciousness. His boss took him home, and his wife took him to the hospital. AR 59.

When asked about the last job he held, Plaintiff indicated he drove a "harobed" in the fields, picking up hay. He would regularly lift 150 to 175 pounds, depending upon the weight of

---

[1]References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

the bale of hay.  AR 67.  He did not do a lot of standing or walking in that position, rather it was sitting and driving.  AR 68.  He also did landscaping work at a golf course.  That position involved mowing lawns, cleaning and smoothing sand pits, and related maintenance.  AR 68.

Plaintiff's conditions causing disability include brain blockage, hearing problems, fibromyalgia, back pain and spine problems, dizziness, blurry vision, weakness, and depression. AR 41.  He continues to experience dizziness every day and often "staggers like [he is] drunk." AR 59-60.

With specific regard to his back pain, Plaintiff indicated the pain occurs throughout his lower back and "down to the back of rear bone."  AR 42.  The pain is constant and burning, causes weakness and soreness, and on a scale of one to ten, Plaintiff rates the pain as a ten.  AR 42-43.  He takes seven medications to treat his conditions; he takes Vicodin for the back pain.[2] Use of those medications relieve his pain to "about a five" on the pain scale.  AR 43, 45; *see also* AR 61 [it helps "a lot"].  When asked whether there was anything else that helps reduce his back pain, Plaintiff replied "[d]efinitely not."  AR 45.  His back pain is worsened by lifting, bending, walking for a long period of time, sitting, and twisting and turning.  AR 44.

Plaintiff also experiences constant pain in both arms and weakness in his hands.  He experiences constant pain in both legs and both hips, with "a burning."  AR 43-44.  He has used a cane at all times for the past year and a half.  AR 59.  The cane was prescribed, but he cannot recall the name of the doctor issuing the prescription.  AR 58.  Because he has fallen in the past and has hit his head, Plaintiff uses the cane as he gets weaker.  AR 59.

In addition to Vicodin, Plaintiff takes medications to treat depression and an inability to sleep.  AR 45.  The medication to treat depression does "[n]ot really" help, however, he does not receive any counseling or other mental health treatment.  AR 46.

---

[2]On the day of the hearing, Plaintiff took two Vicodin because he "was hurting very bad in [his] spine . . back, and [] hips."  AR 60-61.

3

When asked about side effects from medication, Plaintiff indicated he gets "mean," "hateful" and "ornery" from the depression medication.  He was never that way before.  AR 46.

Once or twice a month Plaintiff sees Dr. Armstrong, who will refill his medications and talk.  The doctor checks his back, checks to see if he can walk a little, and talks about having MRIs performed on his back, neck and legs, as well as a "heart gram on [his] heart."  AR 46-47.

When he was asked a series of questions about an eight-hour period similar to a workday, Plaintiff indicated he could lift maybe two pounds on a regular basis, and stand for fifteen minutes before needing to change position.  He cannot however then stand again because he would need to lie down as he gets "so weak."  AR 41, 47-48.  He can walk for about 200 yards, or for thirty to forty-five minutes, at one time.  He would not be able to repeat that walk later in the day however.  AR 48.  Plaintiff can sit for fifteen to twenty minutes at one time before needing to move around.  He does not believe he would be able to sit down again later in the workday for another fifteen to twenty minutes.  AR 48.

Also, in a single eight-hour workday, Plaintiff indicated he would need to lie down for six to seven hours.  AR 49.  He cannot bend at the waist, stoop, squat, crouch, or climb a ladder.  He could "crawl like a baby" if he had to, and could slowly climb about seven stairs.  AR 49.  He has difficulty using his hands because they tense and become weak and tight.  AR 49-50.  He is right-handed, but could not pick up coins with his fingers were they in front of him.  He can hold a coffee cup with either his right or left hand, but he cannot discern whether something he is holding is hot or cold, smooth or rough.  AR 50.  He can twist a doorknob with his right hand, but not his left because it is weaker and will "cramp up."  AR 50-51.

Plaintiff also suffers from memory problems.  For example, if he went to the grocery store for five items without making a list, he would not remember any of the items.  AR 51.  While he watches television, he cannot sit and pay attention to a half-hour television show.  Rather, he can watch about ten minutes of it before he would have to get up.  AR 51-52.

With regard to his hearing, Plaintiff is hard of hearing but he does not know the extent of the problem because he has not been tested since he was in school.  Additionally, while he just picked up new prescription glasses, Plaintiff testified that his vision is blurry *with* and without the corrected lenses.  AR 52-53.  Plaintiff also indicated he suffers from cancer of the skin, nose and hands.  AR 53.

In a typical day, Plaintiff's wife will cook; he helps once in a while.  AR 54.  She also helps him take a bath or shower because he is weak and afraid of falling.  AR 54.  When he gets up in the morning, Plaintiff makes coffee and uses the microwave.  He goes outside and "sit[s] around the table," until he needs to get up and walk.  He alternates between sitting and standing. He will sleep "for about an hour to relieve the pain," before getting up and eating a sandwich. Then he goes back outside again to sit, get up, walk out in the driveway, lean against the car, and walk back to the table again to sit.  AR 55.

Before becoming disabled, Plaintiff used to help with household chores like washing dishes, making the bed, and vacuuming, but he no longer does so.  AR 57.  He used to enjoy car races, camping, fishing, shopping and going out to eat, however, he can no longer do those things.  AR 58.

Plaintiff sleeps for two to three hours a night; otherwise, he sits up.  AR 54.  He sleeps about an hour during the day.  AR 55.  The sleep problems Plaintiff attributes to depression; he has "a lot on [his] mind."  His doctor has not recommended counseling.  AR 58.

While he earned a GED, Plaintiff doesn't really understand what he's read.  He has difficulty pronouncing "[l]ong words."  AR 55.  He does read the newspaper to "read about what's going around in the area."  AR 55-56.  He also reads the Bible and participates in a weekly Bible study.  AR 56.  He no longer attends church regularly because he cannot sit that long without standing up.  AR 56.

### *Lay Testimony*

Lou Ann Dautrich Mathewson has known Plaintiff for about fifteen years.  AR 62-63.  She used to be his supervisor at Anberry Rehabilitation Hospital in Atwater.  AR 63.  She sees him about four to five times a week at his home; he stopped visiting her at her home about two years ago.  AR 63.

Plaintiff gets very dizzy and walks like a drunk person would.  He needs assistance getting to a chair when he nearly falls after walking to the kitchen.  He also seems to be forgetful and she noticed this difference following his loss of consciousness at work.  AR 63-64.  He also suffers from a lot of back pain and cramping and has difficulty walking.  He cannot "comprehend what a movie's about," or what he has watched on television.  AR 64.  He is also "a real depressed person now" because he is not able to work.  AR 65.

Although she and her husband could not afford to attend the races every weekend, Plaintiff went to the Friday or Saturday night races every weekend.  He no longer attends the races although his grandson races midget cars.  AR 65.  Plaintiff's wife told her that they no longer visit at her home because Plaintiff "panics."  AR 65.  They also no longer enjoy family get-togethers or bonfires like they used to.  AR 65.

When Ms. Mathewson visits, Plaintiff is usually just sitting, or sometimes sleeping.  He is a different person "since he's lost consciousness."  AR 66.

### *VE's Testimony*

VE Ferra identified Plaintiff's past work as follows: truck driver, performed very heavy and semiskilled, SVP[3] of four; and landscaper or greens keeper II, medium and semiskilled, SVP of three.  AR 70.

In the first hypothetical question, the VE was asked to consider an individual of the same age, education, and work experience as Plaintiff, who has the ability to occasionally lift, carry, push or pull fifty pounds and frequently lift, carry, push or pull twenty-five pounds, who can sit,

---

[3]"SVP" refers to Specific Vocational Preparation.

stand and/or walk for six hours in an eight-hour day, and who can occasionally balance.  AR 70-71.  VE Ferra indicated such an individual could perform Plaintiff's past work as a landscaper, and could also perform the work of a truck driver as regularly performed in the national economy, but not as Plaintiff actually performed it in the past.  AR 71.

In a second hypothetical, the VE was asked to consider the same individual with the additional non-exertional limitations of the ability to learn and remember simple instructions and tasks, follow a schedule, make decisions, and complete simple tasks consistently, and the ability to work around others and adapt to the normal stressors of full-time employment.  AR 71-72. VE Ferra indicated that such an individual would be unable to perform Plaintiff's past relevant work.  AR 72.  Nevertheless, the individual would be capable of performing other jobs in the national economy.  More specifically, the individual could perform the following work: cleaner, DOT[4] 381.687-026, with approximately 116,000 positions available in California; harvest worker, DOT 403.687-018, with approximately 61,000 positions available in California; and laundry laborer, DOT 361.687-018, with approximately 2,500 positions available in California. National figures are obtained by multiplying those numbers by ten.  AR 72.

In a third hypothetical, the VE was asked to consider an individual with the ability to lift two pounds occasionally or frequently, who can stand and walk for forty-five minutes to one hour (but stand no more than 15 minutes at a time and walk no more than 30-45 minutes at a time) in an eight-hour workday, and sit for fifteen to twenty minutes at a time in an eight-hour workday, and who must lie down for six to seven hours a day, and cannot stoop.  AR 72.  VE Ferra indicated such an individual would be unable to perform Plaintiff's past work, nor any other work in the national economy.  AR 73.

In a fourth hypothetical posed by Plaintiff's counsel, wherein the worker identified in the first hypothetical also required the use of a cane for ambulation and balance, VE Ferra indicated such an individual would be unable to perform Plaintiff's past work.  AR 73.  However,

---

[4]"DOT" refers to the Dictionary of Occupational Titles.

sedentary and light work would be available.  Three examples of such work include the following: cashier II, light, DOT 211.462-010, with approximately 113,000 positions available in California; order clerk, sedentary, DOT 209.567-014, with approximately 2,200 positions available in California; and call out operator, sedentary, DOT 237.367-014, with approximately 1,200 positions available in California.  National figures are obtained by multiplying times ten. AR 73-74.

When Plaintiff's counsel asked whether the aforementioned positions would erode were a sit/stand option required, VE Ferra indicated the available cashier positions would be reduced by ninety percent, and the order clerk and call out operator positions would be reduced by twenty-five percent each to accommodate a sit/stand option.  AR 74.

**Medical Record**

The entire medical record was reviewed by the Court.  AR 258-547.  The medical evidence will be referenced below as necessary to this Court's decision.

**ALJ's Findings**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  AR 18-31.

More particularly, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 17, 2007.  AR 20.  Further, the ALJ identified disorder of the back and an adjustment disorder with mixed anxiety and depression as severe impairments.  AR 20-21. Nonetheless, the ALJ determined that the severity of the Plaintiff's impairments or combination of impairments did not meet or exceed any of the listed impairments.  AR 21-22.

Based on his review of the entire record, the ALJ determined that Plaintiff has the RFC to lift and carry or push and pull fifty pounds occasionally and twenty-five pounds frequently, to sit, stand and/or walk for six hours in an eight-hour day, and to occasionally balance, with the ability to remember and perform simple, repetitive tasks, follow a schedule, work with and around others, and adapt to changes and handle normal stressors in a work setting.  AR 22-29.

1    Next, the ALJ determined that Plaintiff was unable to perform any of his past work.  AR

2    29.  Nevertheless, based upon Plaintiff's age, education, work experience and RFC, the ALJ

3    determined there were jobs that existed in significant numbers in the national economy that

4    Plaintiff could perform.  Specifically, the ALJ found Plaintiff could perform the work of a

5    cleaner, harvest worker or laundry laborer.  AR 29-31.

6                              **SCOPE OF REVIEW**

7        Congress has provided a limited scope of judicial review of the Commissioner's decision

8    to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

9    this Court must determine whether the decision of the Commissioner is supported by substantial

10   evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

11   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

12   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

13   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

14   401.  The record as a whole must be considered, weighing both the evidence that supports and

15   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

16   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

17   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

18   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

19   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

20   substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

21   Cir. 1987).

22                                 **REVIEW**

23       In order to qualify for benefits, a claimant must establish that he is unable to engage in

24   substantial gainful activity due to a medically determinable physical or mental impairment which

25   has lasted or can be expected to last for a continuous period of not less than twelve months.  42

26   U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

27

28                                       9

1   such severity that he is not only unable to do her previous work, but cannot, considering his age,

2   education, and work experience, engage in any other kind of substantial gainful work which

3   exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

4   The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

5   Cir. 1990).

6         Here, Plaintiff argues that the ALJ (1) improperly evaluated the medical evidence; (2)

7   improperly rejected lay testimony; and (3) erred in evaluating Plaintiff's credibility.

8                                          **DISCUSSION**[5]

9         **A.    *The ALJ's Evaluation of the Medical Evidence***

10        Plaintiff contends the ALJ erred in failing to give sufficient reasons to reject the opinion

11  of examining physician Aimee Riffel, Ph.D.  (Doc. 16 at 3-6.)  Defendant asserts the ALJ

12  properly discounted Dr. Riffel's opinion.  (Doc. 18 at 7-10.)

13        Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

14  who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

15  (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

16  physicians).  As a general rule, more weight should be given to the opinion of a treating source

17  than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643,

18  647 (9th Cir. 1987).  At least where the treating doctor's opinion is not contradicted by another

19  doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

20  1391, 1396 (9th Cir. 1991).  Even if the treating doctor's opinion is contradicted by another

21  doctor, the Commissioner may not reject this opinion without providing "specific and legitimate

22  reasons" supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722

23  F.2d 499, 502 (9th Cir. 1983).

24

25        [5]The parties are advised that this Court has carefully reviewed and considered all of the briefs, including

26  arguments, points and authorities, declarations, and/or exhibits.  Any omission of reference to a specific argument or
    brief is not to be construed that the Court did not consider the argument or brief.

27

28                                          10

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer v. Sullivan*, 908 F.2d at 506 n. 4; *Gallant v. Heckler*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989); *Andrews v. Shalala*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir. 1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians . . .." *Magallanes*, 881 F.2d at 752. Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

### Summary of Pertinent  Medical Evidence

#### Dean Chiang, M.D.

Board certified internist Dean Chiang, M.D., performed a comprehensive internal medicine evaluation on March 25, 2008. AR 337-340. After recording a history of the present illnesses by Plaintiff, and the impact upon his activities of daily living, Dr. Chiang recorded his own findings. With regard to general appearance, the doctor noted that Plaintiff began to shake

and cry several minutes into the interview, stating he was "'hurting bad,'" asking "'What's wrong with me?'" and shouting for help.  Plaintiff calmed down after about ten minutes, and his wife indicated such outbursts occur daily.  Dr. Chiang also noted that Plaintiff was "using a cane, he was quite tremulous and wobbly and had to be helped . . .."  AR 338.

On physical examination, Dr. Chiang noted largely normal findings, with regard to vital signs, head/ear/nose/throat, neck, chest, cardiovascular, abdomen, range of motion, sensory exam, reflexes, and cranial nerves.  AR 338-340.  With regard to Plaintiff's coordination/station/gait, Dr. Chiang recorded: "Gait very unsteady and Romberg was present [when] the claimant closed his eyes he started to fall backward and had to be caught by myself. He was not able to stand on his toes or heels."  AR 339.  Dr. Chiang also noted Plaintiff was "using a wooden cane given to him by his physician."  AR 339.  With regard to motor strength and muscle bulk and tone, the doctor noted normal objective findings regarding muscle bulk and tone, and "[s]trength was 4/5 throughout and he has a very poor effort."  AR 339.

Dr. Chiang diagnosed "[p]ossible anxiety" and noted the "reason for the claimant's symptoms is not entirely clear.  As per his medical records he had essentially negative workup."  AR 340.  Finally, regarding functional assessment, the doctor concluded:

> At the present time I doubt the claimant can stand, walk and sit for a regular eight hours, at most perhaps two hours.
> He needs to continue to ambulate with a cane.
> He should not lift or carry any weight.
> He should not perform any frequent bending, stooping or crouching.
> He does not have any manipulative limitations.
> There are no other visual, communicative or workplace environmental limitations.

AR 340.

*Aimee V. Riffel, Ph.D.*

On May 16, 2008, licensed psychologist Aimee Riffel performed a psychological evaluation of Plaintiff.  AR 394-398.  Dr. Riffel noted that Plaintiff was alert and oriented to person, place and time, compliant, depressed with congruent affect, thought content was

appropriate, and there was no current suicidal ideation, recent and remote memory were variable but intact, and Plaintiff was able to perform a simple two-step command.  The doctor noted "poor" concentration/conversation, and a fair to poor fund of knowledge.  Plaintiff could recite five digits forward, but none in reverse.  His insight and judgment were recorded as fair.  AR 395.

With regard to the activities of daily functioning, Dr. Riffel noted that Plaintiff reported he lies "around all day and hope[s] to die."  AR 396.  Plaintiff does not require the assistance of others regarding toileting, feeding, using a telephone, or preparing easy meals.  AR 396.  He does require assistance with bathing, grooming and dressing, travel, shopping and preparing full meals.  AR 396.  He is unable to perform housework, take medications without reminders, manage daily financial tasks, maintain a schedule or keep appointments, and reported difficulty relating to peers, and anxiety and panic attacks in public situations.  AR 396-397.

Dr. Riffel recorded a diagnosis of adjustment disorder, mixed with anxiety and depression, and a GAF[6] score of 50.  AR 397.  She indicated that there "did not appear to be any evidence" of exaggeration by Plaintiff, and recorded Plaintiff's prognosis for the next twelve months to be "fair to poor."  AR 397.  The doctor's medical source statement concluded that Plaintiff's ability to understand, remember, and follow very short and simple instructions was poor, his ability to maintain appropriate levels of concentration, persistence and pace necessary to perform a one or two-step simple and repetitive task was poor, as was his ability to relate to others, tolerate stress, and manage routine changes in the workplace.  AR 397.  Lastly, the doctor opined that Plaintiff would be unable to manage his funds.  AR 398.

---

[6]The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's overall level of functioning. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 2000) ("DSM IV").  The Commissioner has determined that the GAF scale does not have a direct correlation to the severity requirements in the listings of mental disorders.  65 Fed.Reg. 50746, 50764-65 (2000).

*Psychiatric Review Technique & Mental RFC Assessment*

Psychologist and medical consultant Eugene Campbell prepared a Psychiatric Review Technique and a Mental RFC Assessment on August 6, 2008.  As to the former, Dr. Campbell found Plaintiff's affective disorder to be a medically determinable impairment that does not meet the criteria of Listing 12.04.  AR 441-450.  More particularly, the doctor found Plaintiff to be mildly restricted regarding activities of daily living and maintaining social functioning, and moderately limited with regard to maintaining concentration, persistence or pace.  The doctor found no evidence of episodes of decompensation.  AR 451.  In pertinent part, Dr. Campbell noted as follows:

> CE provided [diagnosis] of adjustment [disorder] mixed with anxiety and depression. [Symptoms] were in the moderate range. [Claimant] reported being in [treatment] and complying . . .. His willingness to use available resources is good and his support system is good.  Yet, examiner concluded that the prognosis is fair to poor.  Examiner also rated some abilities as poor without providing supporting information. [Claimant] followed a simple two-step command as part of the [mental status examination], but examiner concluded that [claimant]'s ability to understand, remember and follow very short and simple instructions is poor.  In addition, she concluded that [concentration, persistence and pace] is poor.  Yet, [claimant] recited 5 digits forward and completed simple tasks.  Other [medical source statements] are also overly restrictive.

AR 453.

In his mental RFC assessment of the same date, Dr. Campbell concluded that Plaintiff was not significantly limited in the following areas: ability to remember locations and work-like procedures; ability to understand and remember short and simple instructions; ability to carry out very short and simple instructions; ability to maintain attention concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual; ability to sustain ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted; ability to make simple work-related decisions; ability to interact appropriately with the general public; ability to ask simple questions and request assistance; ability to accept instructions and respond appropriately to criticism; ability to get along with coworkers and peers; ability to maintain socially appropriate

behavior and to adhere to basic standards of neatness and cleanliness; ability to be aware or normal hazards and take precautions; ability to travel to unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others.  AR 455-456.  Dr. Campbell found Plaintiff to be moderately limited in his ability to understand, remember and carry out detailed instructions, to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and ability to respond appropriately to changes in the work setting.  AR 455-456.  In conclusion, Dr. Campbell's functional capacity assessment finds that Plaintiff can perform simple instructions and tasks, can follow a schedule and directions and complete simple tasks on a consistent basis, can work with and around others, can adapt to changes and handle normal stressors of full time employment, and can meet the expectations of full time employment by performing simple tasks.  AR 457.

*Fariba Vesali, M.D.*

Board certified physical medicine and rehabilitation specialist Fariba Vesali conducted a comprehensive neurological evaluation on April 15, 2010.  AR 538-541.

After taking a complete history from Plaintiff, Dr. Vesali performed a physical examination.  She noted Plaintiff was alert to time, place and person, and answered questions appropriately.  His speech was normal.  Despite asking the doctor to speak louder on occasion, when the doctor spoke with a normal tone, Plaintiff occasionally answered without looking at her face.  He followed a three step command without difficulty.  AR 539.  Plaintiff was reported to have walked with short steps, and deferred tandem gait and heel and toe walking.  Romberg was negative, and the finger-nose test and repetitive alternative hand movements were slow and normal bilaterally.  AR 539.  Plaintiff walked with a cane; he was able to walk without the cane but moaned and complained of pain while dragging his feet.  AR 539-540.

With the exception of those range of motion tests Plaintiff deferred, the findings were all within normal limits.  AR 540.  With regard to straight leg raising, the doctor's results revealed

as follows: "In the seated position negative bilaterally.  In the supine position from 5 degrees, hip

flexion bilaterally. He complains of low back pan and deferred further hip flexion."  AR 540.

Spurling's, Speed's and Phalen's tests were all negative bilaterally.  AR 540.  Tenderness was

noted "all over upper mid and lower back and bilateral upper and lower extremities" in the

absence of inflammation of the tested joints.  Plaintiff deferred Patrick's test due to back pain.

AR 540-541.  Regarding motor strength and muscle bulk and tone, Dr. Vesali recorded as

follows: "The claimant applies give away effort for motor strength tests of bilateral upper and

lower extremities.  Motor strength at maximum effort is 5/5.  There is normal muscle bulk in

bilateral upper and lower extremities."  AR 541.  Sensory exam, deep tendon reflexes and cranial

nerves were all normal.  AR 541.

Dr. Vesali diagnosed chronic low back pain.  Her functional assessment concludes that

Plaintiff should be able to walk, stand and sit without limitation, that he does not need an

assistive device for ambulation, he can lift and carry without limitation, and finally, that he is not

limited by any postural, manipulative or workplace environmental limitations.  AR 541.

In a Medical Source Statement of Ability to Do Work-Related Activities (Physical), also

completed on April 15, 2010, Dr. Vesali found that Plaintiff could lift and carry up to twenty

pounds frequently, and twenty-one to fifty pounds occasionally.  AR 542.  He could sit, stand and

walk for a period of two hours at one time, and could sit, stand and walk for six hours each in an

eight-hour workday.  AR 543.  He does not need a cane to ambulate.  AR 542.  Further, Dr.

Vesali opined that Plaintiff could use his right and left hands to frequently reach overhead, and

could continuously otherwise reach, handle, finger, feel, push or pull.  AR 544.  He could also

continuously use either his right or left foot for the operation of foot controls.  AR 544.  Next,

Plaintiff could frequently climb stairs or ramps, ladders or scaffolds, and could stoop, kneel,

crouch and crawl frequently.  He could occasionally balance.  AR 545.  Dr. Vesali noted

decreased hearing per history, and decreased visual acuity, improved with corrective lenses.  AR

545.  The doctor noted Plaintiff "answers questions appropriately [and] follows three step

16

commands." AR 545. With regard to environmental limitations, it was noted Plaintiff was

capable of frequently tolerating all environmental exposures. AR 546. Finally, Dr. Vesali

opined the following regarding Plaintiff's activities: can shop; can ambulate without wheelchair,

walker or 2 canes/crutches; can walk a block at a reasonable pace on rough or uneven surfaces;

can use standard public transportation; can climb a few steps at a reasonable pace with the use of

a single hand rail; can prepare a simple meal and feed himself; can care for his personal hygiene;

and can sort, handle, or use paper or files. AR 547. Lastly, the doctor concluded that any

limitations listed would not last for twelve consecutive months. AR 547.

### *ALJ Wallis' Findings*

Dr. Aimee V. Riffel, Ph.D., performed a consultative psychological
examination of the claimant on May 28, 2008. The claimant was accompanied by
his wife, who provided some of the information. The claimant was able to
perform a simple two step command. He could remember 5 digits forward. His
complaints were depression, anxiety, poor attention, lack of concentration, sleep
problems, physical restrictions, and memory problems. The claimant told the
doctor that his daily activities were quite restricted. He said he just lies about all
day wanting to die. He said he needs assistance to bathe, groom and dress. He is
unable to do any housework. He is unable to shop alone. He is able to prepare
light foods but unable to cook full meals alone. The claimant's statements to the
doctor about his activities of daily living are inconsistent with the information
give by the claimant and his wife . . .. The claimant identified himself to the
doctor with a California ID card and did not inform her that he is able to and does
drive an automobile.

Dr. Riffel diagnosed an adjustment disorder mixed with anxiety and
depression. She said he has poor ability to understand, remember and follow very
short and simple instructions. He has poor ability to maintain sufficient
concentration, persistence and pace to perform a one or two step simple and
repetitive tasks. His ability to relate to others is poor. His ability to tolerate the
stresses and manage changes in the workplace is poor.

The State agency medical consultants reviewed the record on August 6,
2008, and prepared a psychiatric review technique form. They found a 12.04
adjustment disorder with anxiety and depression. They said the claimant has a
mild degree of limitation in activities of daily living and in maintaining social
functioning. He has a moderate degree of limitation in maintaining concentration,
persistence or pace, and no episodes of decompensation . . .. The State agency
medical consultants also gave a three paragraph note regarding their reasoning.
An episode of syncope[7] was diagnosed as anxiety; there was a normal CT and a
normal MRI of the brain. Dr. Riffel rates some ability as poor without providing
supporting information. The claimant followed a simple two step command as

---

[7]Syncope is commonly called fainting or "passing out." It is a temporary loss of consciousness. *See*
*http://ninds.nih.gov/disorders/syncope/syncope.htm.*

part of the examination, yet the doctor concluded that his ability to understand, remember and follow very short and simple instructions is poor.  She said his support system is good and he is willing to use available resources, and yet she said his prognosis is fair to poor.  She concluded his concentration, persistence or pace is poor, yet he recited 5 digits forward and completed simple tasks.  The State agency medical consultants indicated that the doctor's conclusions are too restrictive.

[¶] John Bonner, M.D., a State agency medical consultant, reviewed the record on October 21, 2008 and prepared a detailed case analysis.  After a two page discussion of the medical record, Dr. Bonner stated:

> ". . . No evidence of significant physical limiting condition, almost all subjective.  05/22/08 CT scan of lumbosacral spine shows only some changes of spondylosis, not very prominent or impressive and unlikely to be a source of significant mechanical low back pain.  Recent 11/14/07 lumbosacral spine series read as normal, as well as thoracic and cervical spine films.  04/01/08 path reports for excisions of squamous cell carcinomas of L thigh and R cheek show clear margins, should be curative excisions.  Interesting that claimant used complaints to obtain permanent jury duty excuse.  Review of MER suggests fraud referral a consideration.  I have reviewed all the evidence in file, and the assessment of 05/06/08 is affirmed."

AR 25-26, emphasis & internal citations omitted.  Further, ALJ Wallis found:

> . . . [r]egarding the opinion of Dr. Riffel, I agree with the State agency medical consultants.  Dr. Riffel does not supply supporting information as to why she rates some abilities as poor.  The claimant performed a two step instruction, yet the doctor says his ability to understand, remember and perform very short and simple instructions is poor.  Other evidence shows that the claimant can and did perform 3 step instructions.  Driving an automobile involves several steps and a fair amount of concentration, persistence and pace.  Dr. Riffel does not mention that the claimant drives, so she must not have been aware of that fact.  I agree with the other reasons stated by the State agency medical consultant regarding Dr. Riffel's opinion, including that the doctor's conclusions are too restrictive.  I have given Dr. Riffel's opinion little weight.

AR 28.

### Analysis

Here, ALJ Wallis gave specific and legitimate reasons for rejecting the contradicted opinions of examining physician Riffel in favor of examining physician Vesali and the nonexamining state agency physicians.[8]

---

[8]To the degree Plaintiff argues Dr. Chiang's March 2008 opinion confirms the later May 2008 opinion by Dr. Riffel, the Court is not persuaded by this interpretation.

Those specific and legitimate reasons include the fact that Dr. Riffel's opinion in particular was internally inconsistent.  In other words, while her testing revealed that Plaintiff could perform simple two step commands, she concluded that his ability in that regard was poor. Rejecting an opinion that contains internal inconsistencies is a specific and legitimate reason to discount the opinion.  *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also Buckner-Larkin v. Astrue*, 2011 WL 4361652 (9th Cir. Sept. 20, 2011). Moreover, nearly two years later, Dr. Vesali's examination revealed Plaintiff was capable of performing three step commands without difficulty.  So too Dr. Riffel's testing revealed that Plaintiff could recite five digits forward, albeit none backward.  Yet the doctor concluded his concentration, persistence and pace were poor.  This too is inconsistent.  A restriction to simple, repetitive tasks adequately captures deficiencies in concentration, persistence and pace.  *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008).  Notably too, an ALJ need not believe everything a physician sets forth, and may accept all, some, or none of the physician's opinions. *Magallanes v. Bowen*, 881 F.2d 747, 753-754 (9th Cir. 1989).  Further, Dr. Riffel's opinion is inconsistent with and lacks support from other evidence in the medical record.  *Id*., at 751. Although it is not expressly stated, this Court's careful review of the ALJ's findings concludes the ALJ also inferred that he afforded Dr. Riffel's opinion less weight because some of the information upon which the doctor relied upon for her conclusions was based upon Plaintiff's own subjective complaints.  An ALJ may reject an opinion based on the claimant's discredited subjective complaints.  *See Thomas v. Barnhart,* 278 F.3d 948, 957 (9th Cir. 2002); *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989).  Here, because he explained his reasons, ALJ Wallis properly rejected Dr. Riffel's opinions.

When the ALJ rejects the opinion of an examining physician in reliance on the non-examining physician, "reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are

1   consistent with it." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *Saelee v. Chater*, 94

2   F. 3d 520, 522 (9th Cir. 1996).   Here, it is significant that the medical record supports the

3   findings of the State agency physicians and those opinions are consistent with the medical record

4   to the degree the State agency physicians found Plaintiff is capable of work.  This record contains

5   a nearly complete lack of objective evidence in support of Plaintiff's claims.  On the other hand,

6   there is substantial evidence to support the ALJ's findings in the form of CT scans, MRI results

7   and x-ray results indicating findings within normal limits and/or mild findings only.  *See, e.g.,*

8   AR 280-282, 288-289, 297-304, 315-316, 356-369, 415-429, 521-535.  Those very findings are

9   the findings upon which the State agency physicians based their opinions.  *See Thomas v.*

10  *Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("opinions of non-treating or non-examining

11  physicians may also serve as substantial evidence when the opinions are consistent with

12  independent clinical findings or other evidence in the record").  Additionally, the treatment notes

13  indicate Plaintiff's symptoms of depression have been, for the most part, well controlled with

14  medication.  His treating sources did not urge him to undergo psychotherapy or counseling for

15  depression, rather they merely continued to prescribe medications. The record contains

16  substantial evidence to support the ALJ's finding that Plaintiff's depression and anxiety are not

17  disabling.

18      The ALJ's reliance upon Plaintiff's ability to drive - which he noted "involves several

19  steps and a fair amount of concentration, persistence or pace" - is not error.  This Court has

20  previously found that driving requires "constant focus, concentration, and maintenance of

21  attention." *See Shafer v. Astrue*, 2009 WL 840603 *9 (E.D. Cal. Mar. 27, 2009).

22      To the degree there are conflicts in the medical evidence, it is the ALJ's responsibility to

23  resolve such conflicts. *Magallanes v. Bowen*, 881 F.2d at 750.  Indeed, this Court must uphold

24  the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Id.*

25  In the final analysis, Plaintiff is asking this Court to adopt his interpretation over that of the ALJ.

26  This Court will not, and cannot, do so.

27

28                                      20

1    In sum, no legal error occurred and the ALJ's findings are supported by substantial

2  evidence.

3       **B.    *The ALJ's Consideration of Lay Testimony***

4    Plaintiff contends the ALJ erred by failing to provide germane reasons for rejecting the

5  lay witness statement.  (Doc. 16 at 6.)  Defendant contends the ALJ properly considered the third

6  party testimony.  (Doc. 18 at 13-14.)

7    Lay witness testimony as to a claimant's symptoms or how an impairment affects a

8  claimant's ability to work is competent evidence which the Commissioner must take into

9  account.  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996); *Dodrill v. Shalala*, 12 F.3d

10  915, 919 (9th Cir. 1993).  The ALJ may reject such testimony if he does so expressly, in which

11  case "he must give reasons that are germane to each witness."  *Dodrill*, at 919.  The ALJ need not

12  discuss lay witness testimony that pertains to whether or not an impairment exists.  *Nguyen v.*

13  *Chater*, 100 F.3d at 1467.  These medical diagnoses are beyond the competence of lay witnesses

14  and therefore do not constitute competent evidence.  20 C.F.R. § 404.1513(a).  However, once an

15  impairment has been established by medical evidence, the extent of the diagnosed impairment

16  may be testified to by the lay witnesses.  20 C.F.R. § 404.1513(e); *Sprague v. Bowen*, 812 F.2d

17  1226, 1232 (9th Cir. 1987).  "If the ALJ gives germane reasons for rejecting testimony by one

18  witness, the ALJ need only point to those reasons when rejecting similar testimony by a different

19  witness."  *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) (citing *Valentine v. Comm'r*

20  *Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009)).

21    Here, ALJ Wallis plainly considered the testimony proffered by Ms. Mathewson.  AR 26.

22  He offered the following reasons for rejecting the testimony:

23        The testimony of the claimant's friend . . . is rather general and vague.
        She said he gets dizzy; he cannot tell what he is watching on TV; he is depressed
24        and does not go to car races anymore. . . .  I find her testimony sheds little light on
        the claimant's condition or limitations.  Thus, I give it little weight.  The medical
25        opinions are more helpful as to the issues upon which this witness testified.

26   AR 28.

27

28                                          21

The Court finds no error.  Here, Ms. Mathewson's testimony is no different than the symptoms or conditions about which Plaintiff himself testified, to wit:  Plaintiff suffers from difficulty walking, forgetfulness, back pain, comprehension issues and depression.  *Cf*. AR 46, 51-52, 58-60 to AR 63-66.  The ALJ gave germane reasons for rejecting this testimony, in particular, where Ms. Mathewson's testimony plainly tracks Plaintiff's it certainly provides nothing new.

Finally, because ALJ Wallis discussed at length and properly rejected Plaintiff's own credibility as discussed *post*, no error could have occurred where the reasons for rejecting Plaintiff's credibility apply equally well to the lay witness statements at issue here.  *Molina v. Astrue*, 674 F.3d at 1121.

### C.    *The ALJ's Credibility Findings Regarding Plaintiff*

Lastly, Plaintiff argues that the ALJ failed to properly evaluate his testimony because, despite a "plethora of general reasons," the ALJ "did not explain what evidence undermined" Plaintiff's testimony, and thus, the reasons offered by the ALJ were not clear and convincing. (Doc. 16 at 6-7.)  The Commissioner asserts the ALJ properly considered Plaintiff's testimony. (Doc. 18 at 10-13.)

A two step analysis applies at the administrative level when considering a claimant's subjective symptom testimony.  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Id*. at 1281-1282.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his symptoms only if he makes specific findings that include clear and convincing reasons for doing so.  *Id*. at 1281.  The ALJ must "state which testimony is not credible and what evidence suggests the complaints are not credible." *Mersman v. Halter*, 161 F.Supp.2d 1078, 1086 (N.D. Cal. 2001), internal quotations & citations omitted ("The lack of specific, clear, and convincing reasons why Plaintiff's testimony is not credible

1   renders it impossible for [the] Court to determine whether the ALJ's conclusion is supported by

2   substantial evidence"); Social Security Ruling ("SSR") 96-7p (ALJ's decision "must be

3   sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

4   the adjudicator gave to the individual's statements and reasons for that weight").

5        An ALJ can consider many factors when assessing the claimant's credibility.  *See Light v.*

6   *Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ can consider the claimant's

7   reputation for truthfulness, prior inconsistent statements concerning his symptoms, other

8   testimony by the claimant that appears less than candid, unexplained or inadequately explained

9   failure to seek treatment, failure to follow a prescribed course of treatment, claimant's daily

10  activities, claimant's work record, or the observations of treating and examining physicians.

11  *Smolen*, 80 F.3d at 1284; *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).  "An ALJ is not

12  'required to believe every allegation of disabling pain' or other non-exertional impairment."  *Orn*

13  *v. Astrue*, 495 F.3d at 635, citation omitted.

14       "Despite the inability to measure and describe it, pain can have real and severe

15  debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from

16  working." *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  It is possible to suffer disabling

17  pain even where the degree of pain is unsupported by objective medical findings.  *Id.*  "In order

18  to disbelieve a claim of excess pain, an ALJ must make specific findings justifying that

19  decision." *Id.*, citing *Magallanes v. Bowen*, 881 F.2d at 755.  The findings must convincingly

20  justify the ALJ's rejection of the plaintiff's excess pain testimony.  *Id.* at 602.  However, an ALJ

21  cannot be required to believe every allegation of disabling pain.  "This holds true even where the

22  claimant introduces medical evidence showing that he has an ailment reasonably expected to

23  produce some pain." *Id.* at 603.

24       ALJ Wallis made the following findings in this case:

25       The claimant's statements regarding the extent of his limitations are not
     consistent.  He testified he can lift about two pounds.  His wife does the cooking.
26   He helps a little bit once in a while, not much.  He needs help from his wife to
     shower and shave.  His wife helps in the shower or bath.  He used to help with

27

28                                              23

household chores.  Three years ago he helped do dishes, make the bed, vacuum, and mop.  He no longer does any such chores.  He sleeps only 2 to 3 hours a night, as is depressed.  He sleeps about an hour during the day.  He testified that he drives, but told Dr. Vesali that he does not drive.  He told Dr. Vesali that he is dependent for all activities of daily living; this is inconsistent with the statements of the claimant and his wife . . ..

In his function report of January 19, 2008, the claimant said *he sleeps off & on all day*.  This is inconsistent with his testimony that he sleeps only 3 or 4 hours in a 24 hour day.  His function report goes on to say his wife also has problems, so they cook what they can together.  He waters and feeds pets.  He can bathe, but he gets tired and it takes him a while.  There is no mention that he needs help with his personal care, such as showering or bathing.  He cares for his hair okay.  He shaves okay, but it take a while.  He dresses, but he aches in his body.  He and his wife prepare meals together or have sandwiches.  They have one hot meal a day; it takes them about an hour to prepare.  They make the bed together, cook when able to and do very little housework every two days.  When he needs to drive, he does.  He shops in stores for food 4 times a month for 2 hours or so.  His children or grandchildren come over.  He sleeps most all the time.  The claimant's wife, Bonnie Corn[,] also completed a function report, 3rd party, on January 19, 2008.  Her report is very similar . . ..  The function reports of the claimant and his wife were prepared on the same day, and likely were prepared together, as they are very similar.  Mrs. Corn also completed a disability report on February 23, 2009 which describes Mr. Corn's difficulties in rather general terms.  There are inconsistencies between these reports and the claimant's testimony and his statements to the doctors.  There is a wide spread between the severity of the claimant's claimed impairments and the paucity of objective findings.  Because of these discrepancies, I have given little weight to the statements of the claimant and his wife.

[¶] There is very little in the way of objective findings in this case.  The claimant has some very severe subjective complaints, despite the paucity of objective findings.  He has indicated that his primary problem is spinal pain, and alleges he can lift only about 2 pounds.  The claimant's credibility is crucial in this case, since the complaints are so great and the objective findings so little.  Dr. Vesali performed a very thorough physical examination.  The claimant's straight leg raising test was negative in the sitting positions on both legs.  It should be similar in the prone position, but back pain was claimed after only 5 degrees of motion.  This sort of difference on the straight leg raising test is usually indicative of an attempt by the patient to mislead the doctor.  The "give away" strength demonstrated by the claimant is another part of the physical examination that raises serious questions regarding the claimant's credibility.  The medical findings led one of these doctors to recommend an investigation of the claimant.

AR 27-28, emphasis in original & internal citations omitted.

The first step in assessing Plaintiff's subjective complaints is to determine whether

Plaintiff's condition could reasonably be expected to produce the pain or other symptoms

alleged.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  Here, as noted above, the

ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to

24

cause some of his alleged symptoms.  AR 27.  This finding satisfied step one of the credibility analysis.  *Smolen*, 80 F.3d at 1281-1282.

With regard to the second step, ALJ Wallis carefully and thoroughly noted Plaintiff's numerous inconsistent statements, in addition to the lack of objective medical evidence, as reasons for concluding Plaintiff's subjective symptom testimony was less than credible.

The reasons provided are specific and legitimate, and thus, acceptable.  *See, e.g.*, *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (inconsistencies between the record and medical evidence supports a rejection of a claimant's credibility); *Smolen v. Chater*, 80 F.3d at 1284 (prior inconsistent statements); *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999) (ALJ may properly rely on conflict between claimant's testimony of subjective complaints and objective medical evidence in the record); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (ALJ properly discredited plaintiff's testimony based in part on her lack of cooperation and "poor effort" during consultative examinations); *Thomas v. Barnhart*, 278 F.3d at 959 (plaintiff's efforts to impede accurate testing of her limitations supported ALJ's determination that plaintiff lacked credibility).  It is plain that ALJ Wallis clearly identified what testimony he found not credible and what evidence undermined Plaintiff's complaints.  *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995).

Finally, it is not the role of the Court to redetermine Plaintiff's credibility *de novo*.  Although evidence supporting an ALJ's conclusions might also permit an interpretation more favorable to the claimant, if the ALJ's interpretation of evidence was rational, as here, the Court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.  *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

In sum, this Court finds that ALJ Wallis' credibility findings convincingly justify his rejection of Plaintiff's testimony.  *Fair v. Bowen*, 885 F.2d at 602.  Therefore, his findings are supported by substantial evidence and are free of legal error.

### RECOMMENDATION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and against Plaintiff Ritchie Corn.

These findings and recommendations will be submitted to the Honorable Anthony W. Ishii pursuant to the provisions of Title 28 of the United States Code section 636(b)(l).  Within fifteen (15) days after being served with these findings and recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:**   **July 9, 2012**          **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE